IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Dorothy M. Wenzler, et al., | Case Nos. 3:08 CV 854 |
| | 3:08 CV 2322 |
| Plaintiffs, | |
| | MEMORANDUM OPINION |
| -vs- | AND ORDER |
| | |
| Regency Hospital of Toledo, LLC, | JUDGE JACK ZOUHARY |
| | |
| Defendant. | |

### INTRODUCTION

This Court consolidated two cases -- *Wenzler v. Regency Hospital*, No. 08 CV 854 and *Smith v. Regency Hospital*, No. 2322 -- for purposes of discovery and motion practice (Doc. No. 13). Defendant Regency Hospital moved for summary judgment against Plaintiff Dorothy Wenzler (Doc. No. 31) and Plaintiff Tamala Smith (Doc. No. 30).

On August 12, 2009, this Court held a status phone conference at which time it advised counsel for all parties that it was granting Defendant's Motions and that a Memorandum Opinion would be forthcoming (Doc. No. 41). For the reasons stated below, Defendant's Motions for Summary Judgment are granted.

### BACKGROUND

Wenzler and Smith were employees of Defendant. Each was terminated by Defendant on separate occasions. Wenzler and Smith allege their respective terminations were the result of unlawful race-based discrimination. They also allege they were subject to hostile work environments.

**Regency Hospital**

Defendant Regency Hospital is an acute care hospital that cares for patients requiring long-term care.  Typically, Defendant's patients originate as patients in other hospitals and are later transferred to Defendant because they require additional care.

Defendant first opened its Toledo location in May 2007, and at that time it was only operating one intensive care unit with nine beds.  However, Defendant planned to open its medical surgical unit later that year, at which time it anticipated an increase in the number of patients.

**Plaintiff Wenzler**

Plaintiff Wenzler is an African-American female.  She was hired by Defendant on June 18, 2007 as a Unit Clerk.  A Unit Clerk is responsible for general clerical duties, including answering phones, preparing charts for new patients, updating charts for existing patients, and other related duties.  Unit Clerks are also responsible for processing physician orders entered into patient charts. Processing physician orders requires Unit Clerks to transfer a physician's orders on a patient's chart to a requisition form, and then sending the requisition form to the appropriate lab.  After the lab order has been sent to the lab by the Unit Clerk, a Registered Nurse (RN) reviews the physician order and confirms the Unit Clerk has properly sent and processed the physician order to the appropriate lab.

At the time Wenzler was hired, she was supervised by Deanna Ritson.  Ritson's employment with Defendant ended, and then Jessica Miller, the clinical director, became Wenzler's supervisor.

Another Unit Clerk, Shauna Stevenson, was hired at the same time Wenzler was hired. Stevenson is a white female.  For the first three weeks of Wenzler's and Stevenson's employment, they underwent training and worked the same schedule.  After this initial training, Wenzler and Stevenson worked alternating days and schedules.

2

All employees of Defendant begin employment on a 90-day probationary period. According to Defendant, Wenzler failed to meet expectations for her position on a number of occasions during her probationary period.

- Wenzler repeatedly called a physician by the wrong name.

- On one occasion, after the work area for Unit Clerks was moved and reorganized for safety reasons, Wenzler moved the entire work area back to its original position without consulting supervisors. Wenzler was subsequently ordered to move the work area back.

- In a more serious incident, Wenzler incorrectly processed a physician's order for an echocardiogram as an order for an EKG. Wenzler also failed to follow the instructions from a social worker on the issue of what information is appropriate to send via fax.

- Wenzler also refused to complete the filings of a particular occupational therapist, Mark Billmeyer; claiming she was just "joking" with Billmeyer.

- On another occasion, Wenzler provided a copy of a patient's chart to the patient's family member without first ensuring the patient had signed the appropriate Health Insurance Portability and Accountability Act (HIPAA) release.

In August 2007, Miller issued Wenzler a formal written coaching notice and performance improvement plan to address specific performance problems (Wenzler Depo., Ex. D). The written form indicates Miller counseled Wenzler about the erroneous EKG order, the potential HIPAA violation, her failure to follow instructions of the social worker, and her refusal to cooperate with Billmeyer. Miller signed the performance improvement plan; Wenzler signed the plan as well but next to her signature Wenzler wrote "I disagree with" (Wenzler Depo., Ex. D).

On September 17, 2007, Wenzler completed the self-evaluation portion of her 90-day probationary period review (Wenzler Depo., Ex. E). Wenzler rated herself as "meets requirements" in all categories. However, Miller rated Wenzler "improvement needed" in three categories.

3

Wenzler's probationary period was extended 30 days in light of her overall score on the review (Miller Decl., Ex. B).

During the extended probationary period, an RN discovered that Wenzler placed a prescription order for the wrong patient (Miller Decl. ¶ 10; Miller Depo., p. 22).  It was this error, Defendant maintains, which led Defendant to terminate Wenzler's employment effective September 26, 2007.

**Plaintiff Smith**

Plaintiff Smith is also an African-American female.  She was hired by Defendant in May 2007 as an RN on second shift.  Initially, Deanna Ritson supervised Smith, but after Ritson left Defendant's employ, Smith, like Wenzler, was supervised by Jessica Miller.

Throughout her employment with Defendant, Smith remained employed by other local hospitals.  Smith also worked at Toledo Corrections, and in July 2007, Smith began full-time employment as an RN with Toledo Hospital (Smith Depo, p. 12).  Once Smith began working at Toledo Hospital, she requested to be moved to contingency status with Defendant as a PRN (a contingency-status RN).  Thus, in July 2007, Smith began working with Defendant on a contingency, as-needed basis as a PRN.  This status change resulted in an hourly pay increase for Smith -- from $25/hour as a full-time RN to $30/hour as a PRN.

On October 21, 2007, during one of her scheduled PRN shifts, Smith showed graphic photos of the genital warts of a non-Regency Hospital patient to other employees (Culver Aff. ¶ 3; Payne Aff. ¶ 3).  The photos were located on Smith's cell phone.

Defendant learned of the incident when Amy Culver, a respiratory therapist, reported the photos to her supervisor, who then reported the incident to Miller.  Defendant investigated the matter. During the investigation, both Culver and Logan Payne, a nursing student and aide, gave written

4

statements confirming they had seen the graphic images on Smith's cell phone (Culver Aff., Ex. A; Payne Aff., Ex. A). Smith testified she got along well with Culver and Payne and knew of no reason why they would provide false statements about her (Smith Depo., pp. 9-10, 17-18).

Miller terminated Smith effective October 25, 2007 for showing the graphic photos to employees. Miller testified that Smith's conduct was inappropriate and violated Defendant's harassment policy (Miller Decl. ¶ 4). Furthermore, Miller testified that she was concerned that Smith's conduct may constitute a HIPAA violation (*id.*).

During her deposition, Smith denied showing the photo, and stated that her termination was unfair (Smith Depo., pp. 58-59). Smith further complains that there are only a few African-American RNs employed by Defendant (Smith Depo., pp. 18-19).

STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id*. When considering a motion for summary judgment, a court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, a court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

DISCRIMINATION CLAIMS

Each Plaintiff brings racial discrimination claims under Title VII, 42 U.S.C. § 1981, and R.C. § 4112, et seq. Claims brought under 42 U.S.C. § 1981 and R.C. § 4112 are subject to the same

5

analysis of discrimination claims brought under Title VII.  *See Hollins v. Atlantic Co.*, 188 F.3d 652, 658 (6th Cir. 1999); *Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St. 3d 607, 609 (1991).  In order to establish a prima facie Title VII discrimination claim, a plaintiff may prove direct or circumstantial evidence of discrimination.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

Circumstantial evidence can be used to raise an inference of discrimination by applying the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  A prima facie case of discrimination exists if the plaintiff can show that she: (1) is a member of a protected class; (2) was terminated; (3) was qualified for the position; and (4) was replaced by a person outside the class, or was treated differently than similarly-situated, non-protected employees. *DiCarlo*, 358 F.3d at 415.  In order to establish plaintiff was treated differently than similarly-situated non-protected employees, plaintiff must show that the non-protected employees "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jones v. Potter*, 488 F.3d 397, 405 (6th Cir. 2007).

If Plaintiffs can establish a prima facie case of discrimination, Defendant must articulate some legitimate, non-discriminatory reason for Defendant's action.  *DiCarlo*, 358 F.3d at 414.  If Defendant satisfies this burden, Plaintiffs must prove that Defendant's reason was a pretext for discrimination. *Id.* at 414-15.

Pretext can be established by showing that Defendant's reason: (1) had no basis in fact; (2) did not actually motivate the decision to terminate; or (3) was insufficient to warrant the decision to terminate. *Chen v. Dow Chem. Co.*, ___F.3d___, 2009 WL 2851351, at *5 (6th Cir. Sept. 8, 2009).

It is Plaintiffs' burden to show that the articulated reason was in fact pretext. *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

**Plaintiff Wenzler**

Wenzler has not established a prima facie case of discrimination because she has failed to put forth evidence that Defendant treated a similarly situated white employee differently under similar circumstances. Stevenson is the only other Unit Clerk employed by Defendant during the time Wenzler was also employed there. There is no evidence Stevenson made errors or created problems similar to those of Wenzler. According to Miller, Stevenson did not exhibit the same performance issues as Wenzler, and in fact Stevenson "caught on fast and performed accurate work in a timely manner" (Miller Decl. ¶ 6).

Because Wenzler has not provided evidence that similarly situated white employees received more favorable treatment, Wenzler cannot make out a prima facie case of discrimination. Defendant is entitled to summary judgment on all of Wenzler's discrimination claims.

However, even if Wenzler could establish evidence of a prima facie case, she has failed to rebut Defendant's legitimate, non-discriminatory reason for its adverse employment action -- namely Wenzler's poor work performance during her probationary period. *See DiCarlo*, 358 F.3d at 414. Wenzler has failed to rebut this non-discriminatory reason with evidence that the stated reason is mere pretext. *See id.* at 414-15. "A plaintiff must do more than simply impugn the legitimacy of the asserted justification for her termination; in addition, the plaintiff 'must produce sufficient evidence from which the jury may reasonably reject the employer's explanation.'" *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 730 (6th Cir. 1999) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994)).

7

Wenzler has not shown that Defendant's articulated reason for termination has no basis in fact. *See Chen*, 2009 WL 2851351, at *5. In fact, the record indicates Wenzler made a number of critical errors in processing treatment and prescription orders, and that she was counseled for insubordination and her poor behavior toward other hospital staff. Nor has Wenzler offered evidence that her poor performance did not actually motivate Defendant to terminate her. *See id.* Finally, Wenzler cannot establish that her poor performance is insufficient to warrant termination. *See id.* Wenzler made critical errors that could have resulted in serious consequences for Defendant's patients. Certainly such errors are a sufficient basis for termination in this context.

**Plaintiff Smith**

Smith also fails to establish a prima facie discrimination claim. Like Wenzler, Smith has failed to establish that she was treated differently than similarly situated white employees. To prove she was treated differently, Smith must "show that the 'comparables' are similarly-situated in all respects." *Mitchell v. Toledo Hosp.*, 964 F.3d 577, 582 (6th Cir. 1992). In order to establish another employee was "similarly situated," Smith is not required to demonstrate an "exact correlation" with a co-worker, but she is "required to prove that all of the relevant aspects of . . . employment . . . were 'nearly identical.'" *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994); *see also Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008).

Smith offers two "comparables." First, John Walsh, the white CEO of Regency Hospital of Toledo, who was accused of sexual harassment by two former employees. An investigation found the allegations to be baseless and Walsh was not disciplined or terminated. Second, two white STNAs were accused of arguing with each other. Each was reprimanded but not terminated, following an investigation.

8

Smith's two comparables do not share "relevant aspects of employment" with her. *See Pierce*, 40 F.3d at 802.  Walsh is the CEO and does not share the same supervisor as Smith.  Nor are his job standards in any way similar to Smith's.  Furthermore, Walsh's alleged harassment was investigated and found to be baseless, while the investigation of the allegations against Smith were confirmed.

The behavior of the two white STNAs is also distinguishable from Smith's behavior.  Ignoring the fact that Smith makes only vague allegations and provides no details of the alleged incident between the two STNAs, arguing is less egregious than showing explicit photos to co-workers.  Any alleged argument between the STNAs did not violate Defendant's harassment policies.

However, even if Smith could establish a prima facie case of racial discrimination, she has failed to rebut Defendant's legitimate, non-discriminatory reason for its adverse employment action: Smith's highly inappropriate behavior in showing graphic images of genitalia to her co-workers. Defendant was well within its rights to maintain its policy prohibiting harassment.  Under Defendant's policies, which Smith acknowledged, highly inappropriate behavior may result in immediate termination (Smith Depo., Ex. B).

Smith has not proven that Defendant's articulated reason for termination has no basis in fact. *See Chen*, 2009 WL 2851351, at *5.  The allegations were supported by the statements of two disinterested employees.  Smith argues strenuously that she did not engage in the alleged conduct. However, it does not matter whether the statements of the witnesses are true or not.  What matters is whether or not Defendant believed them to be true and relied on them in making its termination decision.  Smith has offered no evidence that the alleged incident did not actually motivate Defendant to terminate her. *See id.*  Finally, Smith cannot establish that displaying graphic photos to co-workers is an insufficient basis for termination. *See id.*  Employers in certain industries, such as healthcare,

9

must be allowed to discipline certain misconduct with termination when that conduct endangers the health and privacy of patients.

### HOSTILE WORK ENVIRONMENT CLAIMS

In order to establish a prima facie claim for a racially hostile work environment, a plaintiff must demonstrate: (1) that she was a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment, and (5) the employer is liable because it knew or should have known of the harassment and failed to implement prompt and appropriate corrective actions. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009).  To assess the fourth prong of an asserted prima facie case, courts must examine the totality of the circumstances, considering the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, as opposed to a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

**Plaintiff Wenzler**

Wenzler cannot sustain her hostile work environment claim.  There is no evidence in the record that Wenzler was subjected to racial harassment at all.  In fact, Wenzler testified that while she was employed with Defendant, she was not the object of any derogatory remarks.

> Q.    And I take it that nobody made any racial comments to you while you were there, no derogatory racial remarks?
>
> A.    No, no one made any racial comments to me, it's just how I was treated compared to Shauna [Stevenson].

10

(Wenzler Depo., pp. 105-06).  Furthermore, in her self-evaluation for her 90-day performance evaluation, Wenzler stated she enjoyed working for Defendant (Wenzler Depo., Ex. E).

Not only is the record devoid of any evidence of harassment, there is no evidence of any unreasonable interference with Wenzler's work performance.  Moreover, Wenzler never complained to any manager about racial discrimination or harassment while she was employed by Defendant.

**Plaintiff Smith**

For similar reasons, Smith cannot sustain her hostile work environment claim.  There is no evidence in the record that Smith was subjected to racial harassment at all.  In fact, Smith testified that she did not feel racially harassed.

> Q.    And, based on your testimony today, I assume you did not feel racially harassed while you were working at Regency; is that correct?
>
> A.    Not racially harassed, no.  Not racially harassed, no.

(Smith Depo., p. 58).  Moreover, Smith never complained of any racial discrimination or harassment while employed by Defendant.

### CONCLUSION

For the foregoing reasons, Defendant's Motions for Summary Judgment (Doc. Nos. 30-31) are granted.  Plaintiffs failed to establish Defendant unlawfully discriminated against them when Defendant terminated them, and failed to establish they were subject to a hostile work environment.

IT IS SO ORDERED.

_____s/ *Jack Zouhary*_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

September 24, 2009

11